(C. D. 572)

WALLACE PENCIL CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 17, 1941)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*James F. Donnelly* and *Francis X. O'Donnell*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of St. Louis, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation described in the invoice as an "automatic stamping press for 3 stamps

1

for round hexagon pencils arranged for electric drive but without motor," and described in the entry as a "stamping press." Duty was levied thereon at the rate of 35 per centum ad valorem under paragraph 353 of the Tariff Act of 1930 as an article having as an essential feature an electrical element or device. It is claimed that said article is properly dutiable at but 25 per centum ad valorem under paragraph 372 of said act as printing machinery.

At the hearing held at St. Louis on November 14, 1940, the plaintiff offered a pictorial representation of the imported mechanism, which was admitted in evidence as illustrative exhibit A; a number of lead pencils on which were inscribed "My Country Tis of Thee, U. S. A. 1776" and a white colored map of the United States, which pencils were admitted in evidence as illustrative exhibit B; certain pieces of foil having thereon certain printed words, which foil was admitted in evidence as collective illustrative exhibit C; and a photograph of the dieholder used in connection with the imported machine, which was admitted in evidence as illustrative exhibit D.

In addition to said exhibits, the plaintiff offered in evidence the testimony of Arthur W. Forsyth, vice president of the plaintiff-corporation, who testified that the machine constituting the imported merchandise at bar was imported in a knocked-down condition; that said machine as set up is operated by an electric motor connected thereto by a belt; that said machine stamps a name, design, or slogan on the wooden part of a pencil, as shown by collective illustrative exhibit B; that the material used is a pigment combined with a binder which causes it to adhere to the surface of the pencil; that this pigment or color is applied by means of a die, which die is mounted on a movable arbor, the foil being interposed between the surface of the die and the pencil, pressure and heat being applied to cause the white pigment to be transferred to the pencil; that an electrical heating element is required as an essential part of the operation of the machine; that the foil, which is called stamping foil, feeds down between the surface of the die and the surface of the pencil, pressure being applied by means of cams to transfer the pigment and binder from the paper to the surface of the pencil, the process being assisted by the electrical heating unit; that at one time a regular printing ink was used to print designs on pencils, and that this machine, represented by illustrative exhibit A, is used only for the purpose of printing on lead pencils.

On cross-examination the witness testified in part as follows:

X Q. Is it not a fact that in the operation of this machine that the die which is contained in Illustrative Exhibit D moves down, or is propelled by electrical force or energy, to meet the force of the pencil?—A. By mechanical force.

X Q. And in meeting the surface of the pencil, does it or does it not bite into the wood of the pencil?—A. It does a little bit. We don't want it to, however.

\*      \*      \*      \*      \*      \*      \*

X Q. * * * Am I correct in understanding your direct testimony that you stated that the machine stamps the name or a design on the pencil?—A. Yes.

X Q. When you used the word "stamped" in that testimony, did you use it in the same sense as you would use the word "printing?"—A. It is the equivalent, I think. We have terms around the factory. We say we stamp the pencils. Actually we transfer a substance on which is in effect the equivalent of printing on the pencil.

X Q. In other words, you regard the word "stamping" and the word "printing" synonymously?—A. In our case, yes.

X Q. Did you ever hear of printing which would cause an indentation in the wooden surface of something, of a pencil for instance, and cause a portion of that wooden surface to be raised in the form of a design or letters?—A. I am not familiar with any other process of printing on wood.

*　　*　　*　　*　　*　　*　　*

X Q. How were the letters "U. S. A." formed on the pencil?—A. By having a vacant spot left in the die.

X Q. By vacant spot, what do you mean?—A. This map in here consists of a solid steel die, and the letters "U. S. A." are cut out. No pressure will be applied to the foil in that part.

X Q. But around the letters "U. S. A." the die is not cut out so that pressure is applied to the surrounding surface?—A. Yes.

*　　*　　*　　*　　*　　*　　*

X Q. Am I correct in understanding that you regard the printing of ink upon a smooth surface, and the stamping which this machine does, to be equivalent or synonymous operations?—A. Yes, I do.

X Q. Although in the case of printing machinery no pressure is applied other than to deposit a coating of ink upon the smooth surface?—A. That is right.

X Q. And although in the case of the machine at bar heat and a certain amount of pressure are necessary in order to bite into the wood of the pencil?—A. We don't want to bite into the wood.

X Q. Or the plastic coat of the pencil?—A. We don't want to do that either.

*　　*　　*　　*　　*　　*　　*

X Q. Is it not a fact that the machine which is represented by Illustrative Exhibit A is especially designed to take hexagonal shaped pencils?—A. That is right.

X Q. And can the machine operate for its avowed purpose without the rheostats or heating elements which are part of the die-holders?—A. Yes.

X Q. For its intended purpose?—A. Yes.

X Q. Is it not a fact that the most frequent use of this machine is one wherein the heating element and the rheostats are employed?—A. Yes, sir.

*　　*　　*　　*　　*　　*　　*

Mr. TOMPKINS. In view of what has been elicited on cross-examination, I desire to withdraw my concession that it is an essential element. * * *

*　　*　　*　　*　　*　　*　　*

Mr. DONNELLY. If Mr. Tompkins feels that he has a better case with the concession withdrawn, I am agreeable.

*　　*　　*　　*　　*　　*　　*

Judge DALLINGER. It may be stricken.

By Mr. TOMPKINS.

Q. As I understand, in the ordinary course of your business, the electrical heating element is necessary?—A. Electrical heat is necessary.

Judge DALLINGER. You just said you could use the machine without the heating element.

4

The Witness. I said without the rheostat. You could use gas, but electricity is more convenient.

By Mr. Donnelly.

X Q. In any event, you would require some form of heat in order for the machine to operate?—A. Yes, properly.

\*　　\*　　\*　　\*　　\*　　\*　　\*

X Q. Would it have to be revised or built over?—A. Yes.

\*　　\*　　\*　　\*　　\*　　\*　　\*

X Q. The invoice states, does it not, that the machine is an "automatic stamping press for 3 stamps for round hexagon pencils arranged for electric drive but without motor?"—A. Yes, sir.

X Q. Am I correct in understanding that you would regard a stamping press such as Illustrative Exhibit A, and the printing machinery which was employed by the Wallace Pencil Company, where printing ink was used, as being a machine designed for the same purpose?—A. Yes, sir.

## On redirect-examination the witness testified in part as follows:

R. Q. Now, with reference to the use of your machine, am I correct in understanding that you occasionally use the machine in question without heat?—A. Yes, when you want blind stamping.

R. Q. And when it is so used, no foil is used; is that right?—A. That is right.

R. Q. And is any electrical heat at all used when you do blind stamping?—A. No, you have a die with sharp edges to cut into the surface.

R. Q. Now, with reference to the operation of this machine, is it operated by a belt which is connected up with some other machine?—A. Yes, by a motor.

R. Q. And that is a motor which is separate and distinct from the machine itself?—A. Yes.

Judge Dallinger. And was not imported with the machine?
The Witness. No, sir.

By Mr. Tompkins.

R. Q. Could this machine be operated for blind stamping by a steam engine as well?—A. Yes.

## On recross-examination the witness testified in part as follows:

R. X Q. Is there any difference in your mind between a die and type?—A. Yes, sir.

R. X Q. What is the difference?—A. Each letter is separate in speaking of type.

R. X Q. Did you ever hear of a slug lead type?—A. Yes, sir.

R. X Q. Is each letter separate in slug lead type?—A. No.

\*　　\*　　\*　　\*　　\*　　\*　　\*

R. X Q. Is it not a fact that you employ brass and steel dies by reason of the heating element which is employed in connection with this machine?—A. I don't get it. No, I would say it isn't a question of the heating element that goes to the selection of the type of the die.

R. X Q. What does?—A. The amount of wear we subject it to; the amount of gross of pencils that we expect to stamp with the die. For the short runs we use brass. For long runs we use the steel die.

\*　　\*　　\*　　\*　　\*　　\*　　\*

R. X Q. Do you know whether or not you could commercially use lead in connection with the operation of this machine, lead dies, or lead slug type?—A. Yes, you can.

R. X Q. Do you know whether that be a fact?—A. Yes, we have used lead type slug in imprinting pencils.

\*     \*     \*     \*     \*     \*     \*

R. X Q. You have never used lead type in connection with this machine?—A. I don't recall using it.

Upon the entire record we find the following facts:

1. That the machine constituting the imported merchandise at bar is designed and used only to print letters, words, or designs on hexagonal wooden lead pencils.

2. That this printing is done by the use of foil containing a pigment and a heated design in which a line or set of type composed of steel or brass is inserted.

3. That said colored pigment or binder is transferred to and impressed or printed upon the pencils with the use of dies and type inserted therein.

4. That some letters or words printed on the pencils are slightly indented by the pressure of the dies while others are slightly raised, both of which results the user of the machine would like to avoid, if possible.

Counsel for the Government, both at the trial and in his brief filed herein, calls attention to the fact that in the invoice the merchandise is described as an "automatic stamping press for 3 stampings," implying that a stamping press is not printing machinery. However, it is well settled that in a customs case the plaintiff is not necessarily bound by statements in the invoice. *Dwight* v. *Merritt*, 140 U. S. 213; *In re Crowley* et al., 55 Fed. 283; *United States* v. *Puttmann*, 21 C. C. P. A. 135, T. D. 46466. But as a matter of fact the record clearly shows that the instant machine is more than a mere stamping mechanism, its function being to print letters or designs on wooden lead pencils.

We are of the opinion that the case of *Scammell China Co.* v. *United States*, Abstract 22998, 63 Treas. Dec. 1278, is here controlling. In that case this court had before it certain rollers and plates composed of copper, used in machines for printing on porcelain or china. We there held said rollers and plates to be parts of printing machinery, other than for textiles, and as such properly dutiable at the rate of 25 per centum ad valorem under paragraph 372 of the Tariff Act of 1930.

And so in the instant case we hold as a matter of law that the machine constituting the imported merchandise at bar, having as an integral part an electrical heating unit, is both an article having as an essential feature an electrical element or device within the meaning of said paragraph 353 and also at the same time is printing machinery within the meaning of said paragraph 372. Inasmuch, however, as the provision for printing machinery is more specific than the provision in paragraph 353, it follows that the imported machine is properly duti-

able at the rate of 25 per centum ad valorem under said paragraph 372 as printing machinery, as alleged by the plaintiff. *Marr Duplicator Co.* v. *United States*, T. D. 48569, 70 Treas. Dec. 408; *W. W. Erskine* v. *United States*, Abstract 25013, 64 Treas. Dec. 847. That claim of the plaintiff is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.