**FOSTER WHEELER CORP.**

**v.**

**UNITED STATES.**

**C. D. 3556; Protests 65/4552, etc.**

United States Customs Court
Second Division.
Sept. 16, 1968.

Sharretts, Paley, Carter & Blauvelt, New York City, (Joseph F. Donohue and Michael T. Crimmins, New York City, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen., (Mollie Strum, New York City, trial attorney), for defendant.

Before RAO and FORD, Judges.

RAO, Chief Judge:

The merchandise involved in these cases, consolidated at the trial, was imported from Italy and entered at the port of Houston, Texas, on April 23, 1962, February 18, 1963, and November 6, 1964. It consists of various items to be used in a Casale ammonia synthesis unit at the W. R. Grace plant at Big Springs, Texas.

The merchandise described as parts for internal converters, catalyst basket and heater housing tube, covered by protests 65/4552 and 65/4553, was assessed with duty at 35 per centum ad valorem under paragraph 319(b) of the Tariff Act of 1930, as catalyst chambers or tubes, converters, and parts for any of the foregoing.

Additional duty was assessed under paragraph 305(1) and (2) of said tariff

act, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, on the basis of the materials contained in the iron or steel. In addition, some other items were assessed with duty at 19 per centum ad valorem under paragraph 397 of said tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108, as articles or wares not specially provided for, in chief value of iron or steel.

Plaintiff claims that the items covered by said protests 65/4552 and 65/4553 are properly dutiable at 11½ per centum ad valorem or 10½ per centum ad valorem under paragraph 372 of the Tariff Act of 1930, as modified by the said sixth protocol, or by Presidential Proclamation No. 3468, 97 Treas.Dec. 157, T.D. 55615, and Presidential Proclamation No. 3513, 98 Treas.Dec. 51, T.D. 55816, as machines, not specially provided for and parts thereof, the rate depending upon that in effect on the respective dates of entry. It is claimed in the alternative that said merchandise is dutiable at 13¾ per centum ad valorem or 12½ per centum ad valorem under paragraph 353 of said tariff act, as modified by the Torquay protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, and the above-mentioned proclamations, as articles having as an essential feature an electrical element or device and parts

thereof, the rate depending upon that in effect on the respective dates of entry.

The merchandise covered by protest 65/13029 is described as machine accessories, valves, joints, unions, and collar and coupling parts. The valves were assessed with duty at 1.275 cents per pound and 18 per centum ad valorem under item 680.20 of the Tariff Schedules of the United States under the provision for hand-operated and check valves of copper. The other items were assessed at 19 per centum ad valorem under item 610.80 as fittings. It is claimed that all of said merchandise is properly dutiable at 10 per centum ad valorem under item 678.50 of said tariff schedules, as machines, not specially provided for, and parts thereof.

The pertinent statutory provisions are as follows:

Paragraph 319(b), Tariff Act of 1930:

(b) Autoclaves, catalyst chambers or tubes, converters, reaction chambers, scrubbers, separators, shells, stills, ovens, soakers, penstock pipes, cylinders, containers, drums, and vessels, any of the foregoing composed wholly or in chief value of iron or steel, by whatever process made (except by casting), wholly or partly manufactured, if over 20 inches at the largest inside diameter (exclusive of non-metallic lining) and having metal walls one and one-fourth inches or more in thickness, and parts for any of the foregoing, 35 per centum ad valorem.

Paragraph 305(1) and (2), as modified by T.D. 51802:

The additional duties to be levied, collected, and paid under paragraph 305, Tariff Act of 1930, on all steel or iron in the materials and articles enumerated or described in paragraphs * * * 319, * * * Tariff Act of 1930, shall be as follows:

If such steel or iron contains more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, or more than six-tenths of 1 per centum of nickel, cobalt, or any other metallic element used in alloying steel or iron ........................4% ad val.; and

an additional cumulative duty

\*    \*    \*    \*    \*    \*    \*

On the chromium content in excess of two-tenths of 1 per centum .................$1\frac{1}{2}\cancel{c}$ per lb.

Paragraph 397, as modified by T.D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\*    \*    \*    \*    \*    \*    \*

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead) but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*    \*    \*    \*    \*    \*    \*

Not wholly or in chief value of tin or tin plate:

\*    \*    \*    \*    \*    \*    \*

Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum (except \* \* \*) ......................19% ad val.

Paragraph 372, as modified by T.D. 54108:

Machines, finished or unfinished, not specially provided for:

\*    \*    \*    \*    \*    \*    \*

Other (except \* \* \*) ....................$11\frac{1}{2}$% ad val.

[Said rate was reduced to $10\frac{1}{2}$% ad valorem by the Presidential proclamation, referred to above, effective July 1, 1962]

Paragraph 372, as modified:

Parts, not specially provided for, wholly or in chief value of metal or procelain, of any article provided for in any item 372 in this Part. The rate for the article of which they are parts.

Paragraph 353, as modified by T.D. 52739:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\*    \*    \*    \*    \*    \*    \*

Other (except \* \* \*) ...................$13\frac{3}{4}$% ad val.

[Said rate was reduced to $12\frac{1}{2}$ per centum ad valorem by the Presidential proclamation referred to above, effective July 1, 1962]

Paragraph 353, as modified:

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part (not including X-ray tubes or parts thereof) — The same rate of duty as the articles of which they are parts.

Tariff Schedules of the United States:

Taps, cocks, valves, and similar devices, however operated, used to control the flow of liquids, gases, or solids, all the foregoing and parts thereof:

Hand-operated and check:
680.20    Of copper ........................1.275¢ per lb. + 18% ad val.

Pipe and tube fittings, of iron or steel:
\*    \*    \*    \*    \*    \*    \*

610.80    Other fittings ....................19% ad val.

Machines not specially provided for, and parts
678.50    thereof ..........................10% ad val.

———◆———

At the trial, plaintiff called Marvin H. Hiller, who has been senior process engineer of Foster Wheeler Corporation for 13½ years. He described his duties as follows:

In general, a process engineer determines the scheme or the method of carrying out a certain chemical operation, determines the sizes of and specifications for equipment, instruments piping, valves, sets up what we call the flow sheets which are drawings describing the process, carries out economic studies as necessary, and related work in plant design.

Mr. Hiller holds degrees of bachelor of chemical engineering and master of chemical engineering from Brooklyn Polytechnic Institute. Throughout his whole career his work has been related to the planning, designing, and construction of Casale synthesis ammonia units, and he has participated in the design of over a dozen other ammonia synthesis units as well as other types of facilities. He stated that the Casale synthesis process is a process of which Foster Wheeler is the exclusive licensing agent in North America, and that his work had been in terms of very detailed coordination with Casale, handling many mechanical details in addition to more general process work.

The witness was shown the entry and invoice accompanying protest 65/4552 and stated that the items described as parts for internal converters constituted an essentially complete set of internal parts for an ammonia converter. He said that the items described on the invoice covered by protest 65/4553 as a catalyst basket and a heater housing tube were spare parts for a set of internals of an ammonia converter. The items covered by protest 65/13029 consist of various special valves, flanges, and fittings, used in an ammonia synthesis unit. He said they were used in many places in connection with the piping through which the gas flowed.

With the aid of exhibit 1, a schematic drawing of the Casale ammonia synthesis unit, the witness described the way in which the entire unit operates. In brief, it takes a feed gas of nitrogen and hydro-

gen, compresses it, and, through the action of a catalyst, converts it into liquid ammonia.

The witness explained in detail as follows: The synthesis unit receives a feed gas consisting primarily of nitrogen and hydrogen which is compressed in a motor driven compressor to a rather high pressure, typically about 8,000 pounds per square inch. This high pressure is required to allow the conversion reaction to ammonia to proceed at a reasonably economic rate. The compressed gas leaves the compressor fairly hot and is cooled by passing through an air cooler. Water and oil are condensed and drawn off as the gas goes through an oil filter. The feed gas then enters a device known as an ejector, where the pressure is allowed to drop by a substantial amount. The gas flows through a high pressure separator and is fed into an ammonia converter where a substantial portion is converted to ammonia gas. Leaving the converter, the ammonia gas and unconverted nitrogen and hydrogen go through a waste heat exchanger which partly cools the gas and through an ammonia condenser which cools it further and condenses the liquid product ammonia. The stream then goes back into the ejector and the high pressure separator, where the liquid ammonia is withdrawn and the nitrogen and hydrogen recycled through the converter.

The witness explained in detail the functioning of the converter internals. He defined a converter as a piece of apparatus whose specific function is to carry out one step of a chemical reaction under special conditions of temperature and pressure. He said that the outer shell for the converter involved here was built in the United States and the internals were imported. He identified the parts of the internals as the insulating can, the main heat exchanger, the heat exchanger tubes, the heater housing tubes, the catalyst basket, and various small parts. He explained that the reaction of nitrogen and hydrogen to form ammonia is what is known as an exothermic reaction, that is, a reaction which gives off heat. Using exhibit 2, a simplified sketch of an ammonia converter, he described the process as follows: The recycle and feed gases enter the converter at the lower part and flow upward through the annular space between the insulating can and the heat exchanger. In flowing upward, the feed gas is heated by hot product gas which is descending on the other side of the heat exchanger. When it reaches the top of the converter, it has been heated to about 500 degrees F. It is further heated while descending and at the bottom reaches a temperature at which the ammonia reaction will proceed at a substantial rate, provided there is a catalyst present. The catalyst is retained within the so-called catalyst basket. As the gas flows up through the catalyst bed, the reaction takes place. By the time the gas mixture has reached the top of the catalyst bed, about 30 percent of it has been converted to ammonia and is quite hot, about 800 degrees F. The reacted gas flows down again and is cooled to some extent. After leaving the converter, it continues through the waste heat exchanger, where it is cooled to about 300 degrees F. and through the condenser, where it is further cooled and condensed. The liquid product ammonia can be recovered by cooling to a moderate temperature of about 100 degrees F.

The witness testified that all of the equipment illustrated by exhibit 1 is enclosed except for the point at which the gas is introduced and the point where the product is withdrawn. It functions as a single unit.

Mr. Hiller agreed with the definition of a machine as a mechanical contrivance that modifies, utilizes, or applies energy or force, provided the contrivance has a useful function or a useful objective. Within that definition, he said that the entire assembly of equipment is a machine. He identified the parts of the equipment which utilize, modify, or apply energy or force and also stated where the moving parts were located.

According to the witness, the internals for the converter were constructed specially and to specification for use in the

Casale ammonia synthesis unit. They would not be economically suited for any other application. The pressure shell, with some modification, might find some other use.

Mr. Hiller testified that a valve is a mechanical device used to control the flow of a gas, liquid, or solid through a pipe or similar conduit. He said that the valves here were built to withstand very high pressure, 10,000 pounds per square inch. They were made according to Casale's own design down to the very last detail, and range from a size weighing about 10 pounds to one which probably weighs 400 to 500 pounds. The connections into which the piping must fit were also machined in a special manner to suit Casale's design.

The witness said that an electric start-up heater was used with the converter since an external heat source had to be applied when the converter was started after a shut-down. At an initial start-up, it might be used for as long as 3 or 4 days, and in subsequent start-ups for periods ranging from 4 to 24 hours. A gas-fired heater could have been designed for use in place of the electric heater, but it has been characteristic of every Casale synthesis unit to have an electric heater.

The synthesis gas compressor was also built for use exclusively with an electric motor, and, according to the witness, it could be connected to a gas engine only with substantial trouble and expense for modifications.

In the opinion of the witness, the entire unit illustrated in exhibit 1 has electrical devices as essential features. These features consist of the electric start-up heater, and the motors on the compressor, the cooler and the condenser.

Plaintiff claims that all the components included in the three entries before the court are parts of a single entity, the Casale ammonia synthesis unit; that said unit is a machine, and that the imported parts are dutiable either under paragraph 372, supra, as parts of a machine, not specially provided for, or, under paragraph 353, supra, as parts of an article

having as an essential feature an electrical element or device. The parts classified under TSUS are claimed to be dutiable under item 678.50 as parts of machines, not specially provided for.

Defendant counters with three arguments: (1) That plaintiff has failed to offer any evidence with respect to the merchandise classified under paragraph 397, supra; (2) that the merchandise covered by protest 65/13029 must be classified under the specific provisions therefor under TSUS, whether or not they are parts of any other articles, and (3) that the merchandise which consists of internals for the converter is more specifically provided for under paragraph 319(b), supra, as catalyst chambers or tubes, converters and parts thereof, than under either paragraph 372 or paragraph 353.

Plaintiff has called to our attention several cases in which complete plants consist of a number of parts were held dutiable as machines, not specially provided for. C. F. Drew & Co., Inc v. United States, 63 Treas.Dec. 1564, Abstract 24293; Emery Industries, Inc. v. United States, 68 Treas.Dec. 39, T.D. 47789; John A. Steer and Co. v. United States, 24 CCPA 293, T.D. 48737. The case last cited involved several shipments of merchandise comprising, when assembled, a completed anhydrous ammonia plant composed of compressors, heaters, tanks, condensers, and refrigerators, used in the production of liquid anhydrous ammonia from hydrogen and nitrogen by a process of synthesis. From the description given in the opinion of the court, it would appear that the plant resembled the Casale ammonia synthesis unit here involved. The court held that the apparatus was a machine within the purview of paragraph 372 of the Tariff Act of 1930; that the presence of electrical heaters did not constitute it an article having as an essential feature an electrical element or device.

In the instant case, we do not have before us a complete ammonia synthesis unit, but only articles claimed to be parts thereof. On the ground that all of the

imported articles were constructed to specification for use in such a unit and had no other application, plaintiff claims that they are parts of the unit and are dutiable as parts of machines or as parts of articles having an essential electrical feature.

According to the testimony, most of the items involved herein consist of internals for the converter or parts thereof. The converter is an essential component of the synthesis unit without which it would not function for the purpose of producing liquid ammonia. Thus it is a part of the unit. Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849. Plaintiff claims that it follows that the parts of the converter are dutiable as parts of the unit on the principle that "an integral part of an integral part of an article is an integral part of such article." United States v. American Express Co., 29 CCPA 87, 93, C.A.D. 175. In support of its position plaintiff relies on Westinghouse Air Brake Co. v. United States, 26 Cust.Ct. 170, C.D. 1319, and cases cited therein.

In the *Westinghouse* case, it was held that parts of feed water pumps, which pumps were parts of locomotives, were dutiable under paragraph 372 as parts of machines rather than under the basket provision in paragraph 397 covering articles of metal, not specially provided for. The cases cited therein also involved competition between manufacturers in chief value of certain materials and provisions for parts of the whole.

This is also true of United States v. Sheldon & Co., 15 Ct.Cust.Appls. 308, T. D. 42484, and United States v. G. W. Sheldon & Co., 21 CCPA 392, T.D. 46913. In both cases, articles, such as condenser and fittings, and valves and extensions, to be used in and as parts of machines for compressing or producing ammonia, were held dutiable as parts of machines rather than as manufactures of metal.

In Decorated Metal Manufacturing Co. (Inc.) v. United States and Pickfords Colonial (Inc.), 12 Ct.Cust.Appls. 140, T. D. 40061, while it was held that typewriter ribbon spools were classifiable as parts of typewriters rather than as articles of metal, in the course of the opinion the court stated (pp. 143–144):

> * * * It is not infrequent for separate parts of machines to bear particular names of their own, without ceasing to be regarded as parts of the completed machines. In such instances the specific names would of course prevail over the general ones if they appeared in competition in a given tariff provision, but in the absence of a specific enumeration the article would be governed by the next most applicable provision to which it would respond. In the present case for example if the tariff act contained a specific enumeration of ribbon spools or typewriter ribbon spools, as well as that for parts of typewriters, the former would of course control. But there is no such enumeration in the act, consequently the present competition is between the provision for typewriter parts and that for manufactures of metal not specially provided for, and other like general classiications, and as between these the former is manifestly the more specific.

■■ Thus, the difficulty with plaintiff's position in the instant case is that there is a specific enumeration for converters and parts in the Tariff Act of 1930. The articles covered by protests 65/4552 and 65/4553 and assessed under paragraph 319(b), supra, are catalyst baskets and heater housing tubes and other converter internals. They are all parts of converters. The exhibits designate the component in which the ammonia reaction takes place as an ammonia converter and the interior parts as ammonia converter internals. The witness referred to them throughout his testimony as a converter and converter internals. Thus, both the converter and its parts fall squarely within the language of paragraph 319(b) which includes, among others, catalyst chambers and tubes, converters, reaction chambers, and parts for

any of the foregoing. Provisions of such specificity prevail over provisions for parts of an article, including parts of machines. United States v. American Express Co., supra; J. F. Goldkamp & Co. v. United States, 39 Cust.Ct. 420, Abstract 61194; Lador, Inc. v. United States, 48 CCPA 6, C.A.D. 753; Commercial Adolfo S. Pagan, Inc., et al. v. United States, 48 Cust. Ct. 210, C.D. 2337.

United States v. American Express Co., supra, involved film separators in film packs which were claimed to be dutiable as parts of cameras under paragraph 1551 of the Tariff Act of 1930. The court found that the film separators were integral, constituent, or component parts of film packs but held that for tariff purposes film packs were not integral parts of cameras. It pointed out that paragraph 1551 provided separately for photographic cameras and parts and photographic films and held that it was not the intent of Congress that photographic films should be dutiable as parts of cameras.

In J. F. Goldkamp & Co. v. United States, supra, it was held that antifriction balls which were to be used as ball points in the manufacture of ball point pens were dutiable under a specific provision for antifriction balls rather than under the provision for fountain pens and parts thereof. The court stated (p. 422):

> If, as we have held, the ball used in a ball point pen is an antifriction ball, that term becomes the name of a specific part of a fountain pen and, as applied to the merchandise at bar, would be a narrower description and, hence, more relatively specific than the general term "Fountain pens * * * and parts thereof."

In Lador, Inc. v. United States, supra, the court held that small Swiss music box works were properly assessed with duty as parts of music boxes. In the course of the opinion, the court pointed out that even if they were machines, as claimed, they could not be so classified until after it had been established that they were not "parts of music boxes" for tariff purposes.

See also Commercial Adolfo S. Pagan, Inc., et al. v. United States, supra, where it was held that water closet tanks, if in chief value of china, porcelain, or other vitrified ware, were dutiable under paragraph 212 of the Tariff Act of 1930, as modified, as porcelain sanitary ware, even though they were machines.

■ We conclude that whether or not an ammonia converter is part of a machine, it is more specifically provided for under paragraph 319(b), supra, as a converter. It follows that the parts of such a converter are likewise dutiable under said paragraph as converter parts rather than as parts of machines. Where a particular part of an article is provided for specially, a part of that particular part is more specifically provided for as a part of the part than as a part of the whole. Here, for instance, the converter internals do not become parts of machines until they are first parts of converters. Cf. C. F. Liebert v. United States, 60 Cust. Ct. ——, C.D. 3499. In fact, some of the parts here are specifically provided for *eo nomine* in paragraph 319(b), namely catalyst chambers or tubes.

That Congress intended that converters used in connection with the production of ammonia should be classified under paragraph 319(b), supra, is evidenced by the legislative history of that paragraph. No such provision appeared in the Tariff Act of 1922, and when hearings were held on the bill which subsequently became the Tariff Act of 1930, American manufacturers complained of foreign competition in the manufacture of reaction chambers, cylinders, vessels used in the oil, steam, and chemical industries. Tariff Readjustment—1929, Hearings before the Committee on Ways and Means, House of Representatives, Seventieth Congress, second session, volume 3, pages 2487–2491; Hearings before the Committee on Finance, United States Senate, Seventy-First Congress, first session, pages 349–

359. Specifically mentioned were a need in this country for large steel vessels and cylinders for the application of chemical reactions at high pressures and at elevated temperatures and the development of such vessels and cylinders in Germany for use in the manufacture of synthetic ammonia. Paragraph 319(b), supra, was the result. In the Comparative Print of the bill as passed by the House and as reported to the Senate, it is stated under paragraph 319(b):

Note. The products enumerated in this subparagraph have been dutiable under Par. 328 (p. 91 of this print)—old rate 25 per centum ad valorem, Par. 372 (p. 129 of this print)—old rate 30 per centum ad valorem, and 1922 Act, Par. 399 (Bill, Par. 398, p. 143 of this print)—old rate 40 per centum ad valorem.

We conclude that Congress intended to take the articles enumerated in paragraph 319(b) out of classification as machines in paragraph 372.

We find also that the provision for converters and parts in said paragraph, 319(b), is more specific than that for parts of essentially electrical articles under paragraph 353, supra. Cambosco Scientific Co. v. United States, 8 Cust.Ct. 191, C.D. 601; Westinghouse Electric International Co. v. United States, 28 Cust. Ct. 209, C.D. 1411. Where an article is enumerated *eo nomine* elsewhere, the *eo nomine* designation will prevail over the more general language of paragraph 353. Link-Belt Company et al. v. United States, 58 Cust.Ct. 502, C.D. 3028; Textile Printing & Finishing Co., Inc. v. United States, 49 CCPA 24, C.A.D. 789; Fred Roberts Co. v. United States, 46 Cust.Ct. 254, C.D. 2265; Wallace Pencil Co. v. United States, 8 Cust.Ct. 1, C.D. 572.

The merchandise involved herein which was classified by the collector under paragraph 397, supra, as articles of metal, has not been identified in the testimony or the exhibits. We are, therefore, unable to determine whether or not it consists of parts of the synthesis unit or parts of the converter or is in fact a part at all. This merchandise appears among the items designated on the invoice as keys and accessories. The examiner separated out some of the items and advisorily classified them under several paragraphs and then noted, "Bal. as metal arts. nspf cv. iron or steel," (see notation attached to invoice). The presumption of correctness attached to the collector's classification has not been overcome and it must stand.

The merchandise covered by protest 65/13029 was identified by the witness as valves and as fittings for the pipes through which the gas flows during the operation of the ammonia synthesis unit. These articles were classified under the provisions in item 680.20 of the Tariff Schedules of the United States, covering valves and similar devices, used to control the flow of liquids, gases, or solids, and parts thereof, or under item 610.80 which provides for pipe and tube fittings, other. Thus, whether or not these articles are parts of the synthesis unit, and whether or not the unit is a machine or an essentially electrical article, they are classifiable under said specific enumerations. The line of reasoning we have followed in determining the proper classification of the converter parts is reenforced as to the merchandise dutiable under the tariff schedules by the language of the General Headnotes and Rules of Interpretation as follows:

10. General Interpretative Rules. * *

\* \* \* \* \* \*

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

Under this language, it has been held that articles which are described by name or specific function under particular provisions of the tariff schedules are to be classified thereunder, even though they are also parts of another article. J.

E. Bernard & Co. v. United States, 59 Cust.Ct. 31, C.D. 3060; C. F. Liebert v. United States, supra.

For the foregoing reasons, the protests are overruled and judgment will be entered for the defendant.