**J. RAY McDERMOTT & CO., INC.,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**C. D. 4394;  Court No. 71–6–00465.**

United States Customs Court.
Nov. 30, 1972.

Glad, Tuttle & White, Los Angeles, Cal. (Edward N. Glad, Los Angeles, Cal., of counsel), for plaintiff.

Harlington Wood, Jr., Asst. Atty. Gen. (Robert Blanc and Andrew P. Vance, New York City, trial attys.), for defendant.

RAO, Judge:

The merchandise described on the entry involved in this civil action was imported for use in constructing an off-shore oil drilling platform, "Spark," in Cook Inlet, Alaska. The merchandise was described on the invoices as follows:

(1) Jacket for McDermott Project No. 3629

Jacket with holding line and buoy

(2) Box Girder Tank Deck Section for Three-legged Drilling Platform

(3) Components for McDermott Project No. 3629

Pipe Piles

Other Components

These items were manufactured by Mitsubishi Heavy Industries, Ltd. of Tokyo, Japan and were imported into Anchorage, Alaska on or about July 14, 1968. The first two were liquidated at 13 per centum ad valorem under item 652.98, Tariff Schedules of the United States, as modified by T.D. 66-9, as other structures or parts of structures of base metal. The third item was liquidated at 6.5 per centum ad valorem under item 652.94, as modified by T.D. 68-9, as columns, pillars, posts, beams, girders, and similar structural units of iron or steel other than cast iron or alloy iron and steel.

Plaintiff contends that the first two items should also be classified under item 652.94, as modified, on the ground that the jacket is a structural unit of iron or steel other than cast iron or alloy iron or steel similar to columns, pillars and posts and that the box girder or platform section is a structural unit of iron or steel other than cast iron or alloy iron or steel similar to beams and girders.

In the alternative, plaintiff contends that the girder or platform section and the jacket section, either separately or as an entirety, are properly classifiable as a part or parts of excavating, boring, or extracting machinery, whether stationary or mobile, for minerals, under item 664.05, as modified by T.D. 68-9.

The pertinent provisions of the tariff schedules, as modified, are as follows:

Schedule 6, Part 3:
  Hangars and other buildings, bridges, bridge sections, lock-gates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, columns, pillars, and posts, and other structures and parts of structures, all the foregoing of base metal:
    Of iron or steel:
        \*    \*    \*    \*    \*    \*

      Columns, pillars, posts, beams, girders, and similar structural units:
        Not in part of alloy iron or steel:
          \*    \*    \*    \*    \*    \*

652.94         Other ........... 6.5% ad val.
        \*    \*    \*    \*    \*    \*
952.98  Other ..................... 13% ad val.
Schedule 6, Part 4:
664.05  Mechanical shovels, coal-cutters, excavators, scrapers, bulldozers, and other excavating, levelling, boring, and extracting machinery, all the foregoing, whether stationary or mobile, for earth, minerals, or ores; pile drivers; snow plows, not self-propelled; all the foregoing and parts thereof ............. 9% ad val.
  General Headnotes and Rules of Interpretation
      \*    \*    \*    \*    \*    \*

  10. General Interpretative Rules. For the purposes of these schedules—
      \*    \*    \*    \*    \*    \*

    (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

A preliminary question is presented as to what portion of the imported merchandise has been brought within the jurisdiction of the court by this action. Plaintiff claims that the action includes both the article described as a jacket or jacket section and the article called a box girder, box girder tank section, or platform.

Defendant claims that the action covers only the jacket.

The entry describes the merchandise as—

Buildings of iron or steel, N.S.P.F.:
  Other
  Oil-well drilling platform
  jacket section, girder sections,
  pipe piles

The protest filed with the district director at Anchorage, Alaska contains the following:

The above entry covered an oilwell platform jacket imported together with a quantity of American goods returned. Protest is hereby lodged against the liquidation of the jacket at 13% ad valorem under TSUS item 652.9800.

It is hereby further claimed that the oilwell jacket is properly dutiable under TSUS item number 652.9400, or if not under TSUS 652.9400 then at least more properly under TSUS item 664.-0565 than under TSUS item 652.9800.

Reference was made to certain drawings and other material offered in support of the claim, the protest concluding with the statement that the above information and facts were sufficient to allow reliquidation of the entry under item 652.9400 or item 664.0565.

The district director denied the importer's claim and a civil action was commenced in this court by the filing of a summons describing the merchandise as "oilwell platform jacket." The complaint contains the following:

6. The merchandise involved herein consists of an oilwell platform gasket [sic].[1]

  \*     \*     \*     \*     \*     \*

8. Plaintiff contends that the platform is a structural unit similar to beams or girders and that the jacket is a structural unit similar to columns, pillars or posts, all of which are properly dutiable at 6.5% *ad valorem* under Item 652.94, as modified by T.D. 68–9.

  \*     \*     \*     \*     \*     \*

10. The platform in question is a structural unit similar to beams or girders and the jacket in question is a structural unit similar to columns, pillars or posts.

Section 1582 of title 28 of the United States Code, as amended by the Customs Courts Act of 1970, provides that the Customs Court shall not have jurisdic-

---

1. Apparently a typographical error.

tion of an action, unless a protest has been filed and denied, or in the case of American manufacturer's actions, all administrative remedies have been exhausted.

Section 514 of the Tariff Act of 1930, as amended by the Customs Courts Act of 1970, prescribes that a protest "shall be filed in writing with the appropriate customs officer * * * setting forth distinctly and specifically each decision described in subsection (a) of this section as to which protest is made; each category of merchandise affected by each such decision as to which protest is made; and the nature of each objection and reasons therefor."

■ Prior to the amendment, said section provided that the protest must be in writing and set forth "distinctly and specifically, and in respect to each entry, payment, claim, decision, or refusal, the reasons for the objection thereto." Under that section it has been held that the protest must show that the objection made at the trial was in the mind of the party at the time the protest was made and was fairly brought to the knowledge of the collector so that he might have an opportunity to consider and pass upon the claim. American Mail Line, Ltd. v. United States, 34 CCPA 1, C.A.D. 335 (1946), and cases cited. A protest may not be amended so as to bring in merchandise not originally covered thereby, after the statutory period for filing a protest has run. United States v. Macksoud Importing Co. et al., 25 CCPA 44, T.D. 49041 (1937); United States v. Weigert-Dagen et al., 39 CCPA 58, C.A.D. 464 (1951).

The books are replete with cases on the sufficiency of protests, the results reached depending on the language of the protest and the facts in each case. See, for example, Hudson Rissman v. United States, 46 Cust.Ct. 133, C.D. 2246 (1961), holding that a protest referring to figures did not cover vases; Border Brokerage Co., Inc. v. United States, 65 Cust.Ct. 600, C.D. 4145 (1970), holding that a protest referring to a "Mobile Spar Tree" did not include a "Yarder" which was imported at the same time; Clarence S. Holmes v. United States, 37 Cust.Ct. 260, C.D. 1833 (1956), where a protest referring to "Blower machines and parts thereof, including their blowers, motors, or engines" was held to include a feeder which was part of the importation. In the case last cited, the court stated (p. 262):

* * * It would appear that, in describing the merchandise which formed the subject of the protest, plaintiff made no specific reference to the item of the feeder, although evidently regarding the collector's classification of that item as erroneous. Ordinarily, we would be inclined to the view that an article not specified in the protest is not before the court for consideration. However, since both the blower assemblies and the feeder, with its accompanying motor, were described by the collector under one designation as "Parts of machines (blowers) having an electric motor as an essential feature" and were assessed with duty at one rate, we do not regard plaintiff's omission as fatal to its claim for reclassification of the feeder. A more apt description might perhaps have been chosen than the one employed by the plaintiff, but it does not appear that the collector was in doubt as to the character of the items protested, and no question has been raised by the defendant in connection therewith. We shall, therefore, treat this action as covering all items of merchandise assessed with duty at the rate of 17½ per centum ad valorem.

■ In the instant case, the protest uses the terms "oilwell platform jacket," "jacket," "oilwell jacket" and "platform jacket." The latter three appear to be used as shortcuts for the former. The term "oilwell platform jacket" could be interpreted as meaning a jacket for an oilwell platform or as an entity or substructure consisting of a platform (girder section) and a jacket section. That

the latter is the interpretation intended may be deduced from the following: The protest states that the entry covered an oilwell platform jacket together with a quantity of American goods returned. The entry describes the merchandise as oilwell drilling platform: jacket section, girder section, and pipe piles. The jacket section and the girder section were assessed with duty at one rate, 13 per centum ad valorem, under item 652.98. While none of the merchandise was classified as or claimed to be American goods returned, the pipes and other components (the remaining merchandise covered by the entry) were assessed with duty at a lower rate under a different item number. The protest was lodged against the liquidation of the "jacket" at 13 per centum ad valorem under item 652.98 and claimed that the "oilwell jacket" was dutiable under item 652.94 or item 664.05. The protest refers to drawings supporting the claim, which drawings depict both the jacket section and the platform or girder section. In conclusion the protest states that the facts and information given are sufficient to allow reliquidation of the entry under item 652.94 or item 664.05. (The pipes and other components had already been liquidated under said item 652.94.)

While the protest is not as precisely drawn as would be desirable, it may fairly be construed to present the claim that the merchandise designated as an oilwell platform jacket, consisting of a jacket section and a box girder or platform section, assessed with duty at 13 per centum ad valorem under item 652.98, is properly dutiable under item 652.94 or under item 664.05. The court is reluctant to deprive a party of judicial review unless it is clear that the statutory requirements have not been met and the merchandise has not been included in the protest. Chas. Kurz Co. v. United States, 57 Cust.Ct. 73, 76, C.D. 2733 (1966). The court in this civil action has jurisdiction over the merchandise described as the jacket and of that described as a box girder, constituting that part of the imported merchandise called an "oilwell platform jacket" and assessed with duty at 13 per centum ad valorem under item 652.98, as modified.

The evidence herein consists of the testimony of two witnesses called by the plaintiff, 8 exhibits offered by plaintiff, and one by the defendant.

Plaintiff's first witness was Erwin Manning, project coordinator for J. Ray McDermott Company, marine engineers and contractors. As field engineer for that concern, he has been involved in the construction, fabrication and installation of Cook Inlet, Alaska offshore platforms. He had had 10 years' experience directly related to the construction and installation of marine platforms and five years in a related field in the employment of an independent oil company. His firm was the prime contractor for the "Spark" platform.

Plaintiff's second witness was James H. Steger, an engineer with the Atlantic-Richfield Company, whose duties are oilfield drilling and production, including the building of the two offshore drilling platforms of his firm at Cook Inlet, one of which was the platform "Spark." He resided in Japan as the representative of Atlantic-Richfield during the time when the merchandise involved herein was being fabricated. He was familiar with the specifications of the contract and saw the fabrication of the components as they came from the factory. He said the steels used were not alloy iron or alloy steel, nor cast iron.

Plaintiff's exhibits consist of diagrams of platform "Spark" in Cook Inlet, Alaska, for which the components here involved were imported, photographs of the merchandise in the shipyard in Japan, as it was being towed to the United States, and as it was being set in place in Cook Inlet. Defendant's exhibit A consists of a photograph of a four-legged offshore platform used in the Gulf Coast.

According to the evidence presented, the complete offshore drilling platform

is composed of a three-legged, tripod-like portion called a jacket or template; pilings which are driven through the legs of the jacket to anchor it to the ocean bottom; a section called variously a box girder, platform section, deck section, box girder tank and box girder tank section; another platform or plain deck; and the drill rigs and other equipment needed to drill and produce hydrocarbon.

The merchandise imported from Japan consists of the jacket, the box girder, and the piling. These articles were transported by towing by tugboat. The pipe piling and the box girder were placed on a barge and the legs of the jacket were sealed with a welded-on cap and the jacket was floated on two legs and towed.

After arrival at Cook Inlet, the caps were removed from the jacket legs and the jacket was up-ended and set on the bottom of the sea in an upright position. The jacket is 140 feet tall and is set in about 100 feet of water. It consists of 3 legs each having an outside diameter of about 14 feet. The legs are about 80 to 100 feet apart and are joined together to form a tripod. The wall thickness of the metal is upward of an inch and a half thick steel plates, rolled.

After the jacket was up-ended, three 36-inch pipe piles were driven through each leg to about 100 feet into the mud, to anchor the jacket to the bottom. Leveling lugs were welded onto them to level the jacket.

The box girder was then lowered onto the jacket and welded thereto. Between the girders of the box girder there are steel plates which form a water tank, used for the storage of water for drilling mud. Since it is flat on top, it is called a deck, but it is not usable as one. There is but a 2-foot clearance between the top of the box girder and the superstructure.

Additional piles, making a total of six 36-inch piles and six 24-inch piles in each leg, were driven through the legs and the pilings were cemented to the legs.

Mr. Manning testified that after the first three pilings were driven through each jacket leg, concrete was poured into the legs to fill the annulus between the pilings and the jacket in order to cement the bond between them. Thereafter, the box girder was put on and welded.

Mr. Steger stated, however, that the concrete was not poured until all the pilings had been driven. He also said:

> * * * this jacket is 13 feet outside diameter and it has an inner leg which is 4 feet 6 inches in diameter. There is no cement in the inner legs, it's only between the inner leg and the outer leg and around the pilings that is cemented.

After the box girder was welded on and the pilings were cemented to anchor the legs and hold them level, the remaining decks and drilling equipment were installed. Horizontal shipping braces on the jacket were removed.

Mr. Manning testified that in his opinion, the jacket, the pilings, and the concrete bond, as a composite unit, constitute a column. He said it was necessary to use pipe piles and cement before the box girder section could be set on top of the jacket; that it would not be advisable to have the jacket supporting the weight of the box girder section by itself. In addition to holding up the box girder section, the jacket furnishes protection from the waves, the current and the impact of ice, and prevents the structure from overturning.

He considered the box girder section a girder because it is a load-bearing member, transmitting a load from a vertical direction to the legs and piling of the jacket. It holds the entire weight of the deck, the drilling rig, girders, and everything that goes on top.

Mr. Steger testified that the purpose of the jacket, piling and cement is to support the remaining components of the drilling and production platform. The box girder supports the deck sections, the quarters, and the drilling rig. It passes the stress onto the legs, which are columns formed of the jacket and

the cemented piling. The jacket would stand on the bottom without the piling, but might drift or fall over. The function of the piling is to prevent transverse movement of the jacket. In his opinion, from an engineering standpoint, in order to have a completed, safe structure, it is necessary to have the jacket, the pipe piling, and the cement.

Mr. Manning testified that all of the components of a complete drilling platform are essential to the performance of an offshore drilling rig; the absence of any one component would make the others valueless. The imported components are not sufficient to construct a functioning offshore oil platform, but they are sufficient to form the base structure. That substructure has no application other than for an offshore drilling platform. The witness said that an offshore structure, such as that depicted in defendant's exhibit A, is not similar to the one involved herein. It is smaller. It has only four pilings, one down each jacket leg. It bears a resemblance only in that it is an offshore structure designed to hold something.

■ It is not disputed that the jacket section is a part of a structure, but, in order to prevail, it is incumbent upon plaintiff to establish that it is a structural unit similar to columns, pillars, or posts. Laurence Myers Scaffolding Co. v. United States, 57 Cust.Ct. 333, C.D. 2809, 259 F.Supp. 874 (1966). In that case the court noted that the merchandise encompassed by the term "structural shapes" in the Tariff Act of 1930 is now provided for in 17 different items of the tariff schedules. Consequently, imported merchandise is to be classified under the provision which most specifically covers it.

Under the broader language of former tariff acts, the courts conceived of a structural shape as an article, used in buildings and other structures, which had a capacity to sustain relatively heavy loads and to resist great tension, but no precise definition was laid down. United States v. Winkler-Koch Engineering Co., 41 CCPA 121, C.A.D. 540 (1953), and cases cited. However, not every element designed for use as part of a structure, which might be subjected to forces and loads such as tension, compression and the like, has been held to be a structural shape. United States v. Humble Oil & Refining Co. et al., 46 CCPA 138, C.A.D. 717 (1959); James Loudon & Co., Inc. et al. v. United States, 47 CCPA 73, C.A.D. 731 (1960); Inter Continental Equipment Co. et al. v. United States, 48 CCPA 63, C.A.D. 765 (1961).

Thus, oil well casing, which has to resist great external pressure and protect the drilled hole against destruction by forces which at some point may be of as great weight as that of the part of a building which rests upon a beam or girder, has been held to be a structural shape, whereas tubing used within the casing to bring the oil to the surface is not, since its primary purpose is to transport oil and its self-sustaining function is incidental. United States v. Winkler-Koch Engineering Co., supra; United States v. Humble Oil & Refining Co. et al. supra. Defective oil well casing, used as columns in buildings to support beams has been held to have a functional resemblance to such vertical load-bearing members as columns and posts and to be classifiable as structural shapes. Imperial Pipe & Supply Co. v. United States, 66 Cust.Ct. 403, C.D. 4225 (1971).

Plaintiff in the instant case relies upon Universal Builders Supply Co., Inc. v. United States, 48 Cust.Ct. 99, C.D. 2319 (1962). In that case it was held that certain lattice form and solid form supports used in the construction of reinforced concrete buildings to support vertical live and dead loads were structural shapes, on the ground that they possessed the characteristics of supporting heavy loads with a minimum of material and performed the essential function of supporting the building in which they were used.

In Laurence Myers Scaffolding Co. v. United States, supra, which arose under

the Tariff Schedules of the United States, the court considered the meaning of the terms "column," "pillar," and "post," quoting a number of definitions of those terms. It concluded that the concept running through the definitions was that of a unitary element providing upright support to a building or structure. It held that shores consisting of tubular portions which were placed on top of each other, fastened together with coupling pins to obtain the desired height, the topmost one telescoping into the one immediately below, used to provide support to the concrete form work of bridges, highways, and structures during construction, not being unitary, were not columns, pillars, or posts, or similar structural units.

In addition to the definitions quoted in the *Laurence Myers* case, I note the following:

Webster's Third New International Dictionary, Unabridged (1966):

column *n* * * * 2: a supporting pillar: as * * * a hollow steel cylinder with a jackscrew base usu. set up between the floor and roof of mining workings to serve as a mounting for rock drills, light hoists, and other equipment * * *

pillar *n* 1 a: a firm upright support for a superstructure: POST * * * 4: any of various vertical supporting members * * *

post *n* * * * 1: a piece of timber or other solid substance (as metal) fixed or intended to be fixed firmly in an upright position esp. as a stay or support: PILLAR, PROP * * *

■ From the definitions and from the decided cases, it appears that an essential characteristic of a column, pillar, or post insofar as classification for tariff purposes is concerned, is that it be a firm upright support for a structure.

In the instant case, the witnesses testified that the jacket, piling, and cement as a composite unit supported the box girder section and the remaining components of the drilling and production platform. There is no evidence that the jacket alone could have done so. It is clear that some, if not all, the piles were driven through the legs of the jacket and the cement poured, before the girder was lowered onto the jacket. One witness testified that it would have been inadvisable to have the jacket alone support the girder section and another that the jacket without the piling would drift or fall over.

The article here under consideration was referred to throughout the case as a "jacket." Its function bears a closer resemblance to that of a "jacket," as defined by lexicographers, than it does to columns, pillars, or posts. See, for example, the following definitions of "jacket":

Webster's Third New International Dictionary, Unabridged (1966):

jacket *n* * * * 3: an outer covering or casing: as a: a thermally nonconducting cover or lagging (as for a tank, pipe, or engine cylinder); *also*: a covering that encloses an intermediate space through which a temperature-controlling fluid may be circulated (as in water-cooling a gasoline-engine cylinder)

Reader's Digest Great Encyclopedic Dictionary (1966):

jacket * * * d an insulating cover or layer surrounding a pipe, boiler, etc.

Audels Mechanical Dictionary (1942):

jacket.—1. A covering for a steam cylinder, pipe or the like, to prevent the escape of heat * * *.

Chambers's Technical Dictionary (1953):

jacket (*Eng.*). An outer casing or cover constructed round a cylinder or pipe, the annular space being filled with a fluid for either cooling, heating, or maintaining the cylinder contents at constant temperature * * *.

■ The "jacket" involved in the instant case serves as an outer covering for the pipe piles, protecting them from

the waves, the current, and the impact of ice. The annular space between the piling and the jacket is filled with concrete which also serves to form the composite which supports the superstructure. The primary purpose of the "jacket" is a protective enclosure and any support function it may have is secondary. It is part of a structure, but it is not a structural unit similar to columns, pillars, or posts.

The box girder, according to the record, is a load-bearing member, transmitting a load from a vertical direction, holding the entire weight of the deck, the drilling rig, and everything on top. It is therefore a girder within the definition of that term:

Webster's Third New International Dictionary, Unabridged (1966):

girder n 1 a: a horizontal main member supporting vertical concentrated loads (as from beams) b: BEAM; *esp*: an iron or steel beam either made in a single piece or built up typically of plates, flitches, latticework, or bars and often of very large proportions—compare * * * BOX GIRDER * * *

box girder n: a girder or beam of rectangular cross section with two or more webs

■ The imported box girder is properly dutiable under item 652.94 under the provision for girders, which is more specific than the general provision in item 652.98 for "other" structures and parts of structures.

Plaintiff claims, in the alternative, that the jacket and box girder are essential to the complete drilling platform which is alleged to be self-contained stationary boring machinery for minerals and that said jacket and girder are properly classifiable under item 664.05 as parts of such machinery.

■ Whether or not the box girder could be considered a part of such machinery, it is more specifically provided for as a girder under item 652.94, in view of General Interpretative Rule 10(ij), *supra*.

■ Even if the platform structure may be regarded as a part of boring machinery, which is doubtful,[2] the jacket is more specifically provided for as a part of a structure than as part of boring machinery. A part of a particular part is more specifically provided for as a part of the part than as a part of the whole. Foster Wheeler Corp. v. United States, 61 Cust.Ct. 166, 176, C.D. 3556, 290 F.Supp. 375 (1968); American Laubscher Corp. et al. v. United States, 64 Cust.Ct. 384, C.D. 4006 (1970).

For the reasons stated, the claim that the box girder is properly dutiable at 6.5 per centum ad valorem under item 652.-94, Tariff Schedules of the United States, as modified by T.D. 68–9, is sustained. All other claims in the complaint are denied. Judgment will be entered accordingly.

2. *Cf.* United States v. Willoughby Camera Stores, Inc., 21 CCPA 322, 324, T.D. 46851 (1933); H. R. Barthel v. United States, 44 Cust.Ct. 296, Abstract 63658 (1959).