**Slip Op. 05-156**

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| AMOCO CORPORATION, | : | |
| *Plaintiff,* | : | |
| v. | : | Court No. 99-00399 |
| UNITED STATES, | : | |
| *Defendant.* | : | |

[Plaintiff's motion for summary judgment is granted and Defendant's cross-motion is denied, except as to certain claims which are dismissed on Defendant's cross-motion.]

Decided: December 9, 2005

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Steven P. Florsheim and Robert F. Seely), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Bruce N. Stratvert); Michael Heydrich, Office of Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

In this action, Plaintiff Amoco Corporation challenges the denial by the U.S. Customs Service[1] ("Customs") of its protest of Customs' classification of 30 entries covering 19 different but

---

[1]Effective March 1, 2003 the U.S. Customs Service was renamed the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296 § 1502, 2002 U.S.C.C.A.N. (116 Stat. 2135, 2308).

similar epoxy molding compounds ("EMCs") imported from 1995 to 1997.[2]

Amoco contends that the EMCs are classifiable as "epoxide resins in primary forms," under subheading 3907.30.00 of the Harmonized Tariff Schedule of the United States[3] ("HTSUS"), dutiable at a rate of 6.1% *ad valorem*. *See generally* Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Brief"); Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Response Brief"). However, Customs classified the merchandise under HTSUS subheading 3824.90.28,[4] covering "[m]ixtures containing 5 percent or more by weight of one or more aromatic or modified aromatic substances: [o]ther," subject to a higher rate of duty.[5] *See*

---

[2]Amoco's Complaint also challenged the classification of a compound identified as "Plaskeen Melamine." *See* Complaint ¶ 4. However, Amoco expressly abandoned that challenge in its opening brief. *See* Pl.'s Brief at 1 n.1. The issue therefore warrants no further consideration.

[3]Subheading 3907.30.00, HTSUS, covers: "Polyacetals, other polyethers and epoxide resins, in primary forms; polycarbonates, alkyd resins, polyallyl esters and other polyesters, in primary forms: [e]poxide resins."

[4]The subheading under which Customs classified the EMCs was re-numbered in 1996 – from subheading 3823.90.28 (1995) to subheading 3824.90.28 (1996 & 1997). *See* Plaintiff's Statement of Material Facts Not in Issue ("Pl.'s Statement") ¶ 2. However, the heading and subheading text remained the same at all relevant times. *Compare* HTSUS heading 3823 (1995), *with* HTSUS heading 3824 (1996 & 1997).

As an alternative to subheading 3907.30.00, Amoco proposed classification under another subheading of Chapter 38, which was also re-numbered in 1996 – from subheading 3823.90.39 (1995) to subheading 3824.90.39 (1996 & 1997). *See* Pl.'s Statement ¶ 4. Again, however, the text of the heading and subheading remained the same.

For the sake of convenience, all references herein to heading 3824 (and subheadings thereunder) include both heading 3823 (1995) and 3824 (1996 & 1997).

[5]Although the text of subheadings 3823.90.28 and 3824.90.28 remained the same, the duty rate changed over time – from12.9% *ad valorem*, plus 3.3¢ per kilogram in 1995; to 12.2% *ad valorem*, plus 3¢ per kilogram in 1996; to 11.5% *ad valorem*, plus 2.6¢ per kilogram in 1997.

*generally* Defendant's Memorandum in Support of its Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Brief"); Defendant's Reply Brief in Support of Motion for Summary Judgment and in Opposition to Plaintiff's Response ("Def.'s Reply Brief").

Cross-motions for summary judgment are pending. Jurisdiction lies under 28 U.S.C.§ 1581(a) (1994). Customs' classification decisions are subject to *de novo* review pursuant to 28 U.S.C. § 2640 (1994).

For the reasons detailed below, the EMCs at issue are properly classified as "epoxide resins in primary forms," under subheading 3907.30.00 of the HTSUS. Amoco's motion for summary judgment is therefore granted – and the Government's cross-motion is denied – except as to certain claims discussed in section II below, which are dismissed on the Government's cross-motion.

## I. **Background**

### A. Epoxy Molding Compounds ("EMCs") in General

The epoxy molding compounds ("EMCs") in this action are used to protect delicate integrated circuits. In a sense, they are used to create small protective packages around the circuitry. The packaging process is – at least in theory – relatively straightforward. The molding compound is heated until it liquefies. It is then poured into a mold containing the integrated circuit. As the compound cools, it hardens, forming a plastic coating – a cocoon – around the circuitry, protecting it from corrosion and other degrading processes, and minimizing the effects of heat, physical shock,

and other environmental stresses.[6]

Epoxies are ideal for protecting integrated circuits. They are strong, shrink little during the curing process, adhere well, are chemical- and corrosion-resistant, and have superior electrical properties. Even with this combination of properties, however, epoxies alone are not used to encapsulate integrated circuits, because epoxies have low thermal conductivity and a high coefficient of thermal expansion. EMCs therefore contain other substances that help protect both the resin and the heat-sensitive integrated circuits from the heat generated during the curing process.[7]

Silica and quartz are two of the other substances added to complement the qualities of epoxies.[8] In common parlance, silica and quartz are generally considered "fillers." Silica protects the integrated circuits by dissipating heat, increasing thermal conductivity and strength, and decreasing the coefficient of thermal expansion of the epoxies. Quartz enhances impact-resistance

_____

[6]*See* Pl.'s Brief at 6 (*citing* Encyclopedia of Semiconductor Technology 195 (Martin Grayson ed., John Wiley & Sons 1984)). *See also* Pl.'s Statement ¶1; Def.'s Response Statement ¶1; Defendant's Response to Plaintiff's Statement of Material Facts Not in Issue ("Def.'s Response Statement") ¶¶ 8-26; 9 Kirk-Othmer Encyclopedia of Chemical Technology 381-82, 751-52 (4th ed. 1996) (submitted as Exhibit 8 to Def.'s Brief); Hawley's Condensed Chemical Dictionary 447 (14th ed. 2001); Kirk-Othmer Concise Encyclopedia of Chemical Technology 432-33 (1985); McGraw-Hill Dictionary of Chemistry 223 (1984).

[7]*See* 17 Kirk-Othmer Encyclopedia of Chemical Technology 1037; *see also* Plastics Technology Handbook 137-39 (3d ed. 1998); 5 Encyclopedia of Polymer Science and Engineering 800-02 (Rev. ed. 1986); Kirk-Othmer Concise Encyclopedia of Chemical Technology 474-75; The Encyclopedia of Basic Materials for Plastics 174 (1967).

[8]In addition, the EMCs also contain mixed siloxanes, phenolic and brominated resins, antimony tri- and pentoxide, and acrylic modified styrenic rubber. Request for Admissions ¶¶ 8-28; Def.'s Admission ¶¶ 8-28.

and inhibits the cracking of the resin during the curing process.[9]

### B. The Composition of the EMCs At Issue

As set forth in section III below, much of the Government's case focuses on the specific composition of the EMCs at issue here. The epoxy resin powders in these ECMs typically range from 15% to 20% by weight, but may constitute as much as 25%.[10] Silica and quartz combined range from 60% to 85% by weight. The remaining substances never constitute more of the mixture, by weight, than the epoxy resin. *See* Request for Admissions ¶ 1; Pl's Statement ¶¶ 5-10; Def.'s Response Statement ¶¶ 5-10.

## II. The Scope of Amoco's Appeal

As a preliminary matter, the Government (in effect) moves to dismiss certain of Amoco's claims, asserting that Amoco failed to timely protest Customs' classification of the relevant merchandise. Specifically, the Government contends that Protest Nos. 270496103282 and 270496103297 covered *only* "Plaskon LS-16S" (invoiced as "epoxy molding compound LS-16S"). The Government asserts that Amoco's subsequent letter to Customs advising that the two protests were intended to cover 16 additional EMCs must be rejected as an untimely attempt to amend the company's protests to cover additional merchandise. *See* Def.'s Brief at 20-21; Letter from Amoco to Customs (Dec. 9, 1996); Pl.'s Brief, Exh. 3 (Protest No. 270496103282); Answer ¶ 4 (averring

---

[9]*See*, *e.g.*, 5 Encyclopedia of Polymer Science and Engineering 801 (table showing effect on coefficient of thermal expansion of adding different fillers – including silica and quartz – to epoxy resin).

[10]The percentage, by weight, of each substance in the EMCs is reported imprecisely. Instead of exact percentages, Amoco reported ranges.

that the only merchandise covered by two cited protests is "Plaskon LS-16S").

Amoco failed to respond to the Government's challenge in any fashion whatsoever, and is therefore deemed to have abandoned the disputed claims. *See*, *e.g.*, Hanig v. Yorktown Central School District, 384 F. Supp. 2d 710, 723-24 (S.D.N.Y. 2005) (and cases cited there); Martinez v. Sanders, 2004 WL 1234041 at * 3 (S.D.N.Y. 2004) (and cases cited there). In any event, it appears that Amoco would have had little to say.

A timely-filed protest may be amended by submitting, *inter alia*, "[a] specific description of the merchandise affected by the decision as to which the amendment to the protest is filed." 19 C.F.R. § 174.14(c)(3) (1996). However, amendments are not permitted "after the [90-day] statutory period for filing a protest has run." J. Ray McDermott & Co. v. United States, 354 F. Supp. 280, 283 (Cust. Ct. 1972); 19 U.S.C. § 1514(a) (1994); 19 C.F.R. § 174.11-14 (1996). And there can be no argument that Amoco's belated letter did not constitute an "amendment." *See generally* Tail Active Sportswear v. United States, 16 CIT 504, 507-08, 793 F. Supp. 325, 328-29 (1992) (even assuming that purported second page of protest existed, importer alleged only that it referred to "women's lined tracksuits"; thus, it could not have constituted effective protest as to "men's lined tracksuits").

### III.  Standard of Review

Under USCIT Rule 56, summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to . . . judgment as a matter of law." USCIT R. 56(c).

Customs' classification rulings are reviewed through a two-step process: first, construing the relevant tariff headings, which is a question of law; and second, determining whether the

merchandise is properly classified under the headings, which is a question of fact. <u>Bausch & Lomb, Inc. v. United States</u>, 148 F.3d 1363, 1365 (Fed. Cir. 1998). Thus, in classification cases, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." <u>Bausch & Lomb</u>, 148 F.3d at 1365 (citations omitted).

Here, although the parties argue for different classifications, they agree that there are no genuine disputes of material fact. *See* Plaintiff's Motion for Summary Judgment at 2; Defendant's Motion for Summary Judgment at 1. The case is therefore ripe for summary judgment.

While Customs' classification rulings do not merit <u>Chevron</u> deference, they are entitled to "a respect proportional to [their] 'power to persuade.'" <u>United States v. Mead Corp.</u>, 533 U.S. 218, 235 (2001) (*citing* <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000); <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)). "That power to persuade depends on the thoroughness evident in the classification ruling, the validity of its reasoning, its consistency with earlier and later pronouncements, the formality attendant the particular ruling, and all those factors that give it power to persuade." <u>Mead Corp. v. United States</u>, 283 F.3d 1342, 1346 (Fed. Cir. 2002) (footnote omitted) (citations omitted).

## IV. <u>Analysis</u>

### A. <u>HTSUS Heading 3907</u>

Amoco asserts that the EMCs at issue are properly classified under heading 3907 of the HTSUS – specifically, subheading 3907.30.00. HTSUS heading 3907 covers:

Polyacetals, other polyethers and *epoxide resins, in primary forms*; polycarbonates, alkyd resins, polyallyl esters and other polyesters, in primary forms:

. . .      *Epoxide resins*

3907.30.00, HTSUS (emphases added).

"Epoxides" refer to a chemical composition commonly called "epoxy," and characterize epoxy resins.[11]  The parties agree that the EMCs here contain epoxy resins.  The parties also agree that those epoxy resins are the "epoxide resins" specified by name both in heading 3907 and in subheading 3907.30.00.  Pl.'s Statement ¶¶ 5,7; Def.'s Response ¶¶ 5, 7.

Where the parties disagree is on whether the epoxide resins here are in "primary form."  The Government argues that – due to the quantity and importance of the silica and quartz present in these EMCs – the EMCs are not "epoxide resins in primary forms" but, rather, products "engineered from resins in primary forms."  Def.'s Reply Brief at 6.  Amoco maintains that the silica, quartz, and other substances added to the resin do not preclude the EMCs' classification as "epoxide resins," because the HTSUS expressly contemplates their presence.  Pl.'s Brief at 10-11.

Chapter Note 6 to Chapter 39 of the HTSUS explains that – as used in heading 3907, among others – the term "primary forms" embraces (among other forms) "powders (including moulding powders)."  Explanatory Notes, Ch. 39 Note 6 at 590.  The parties agree that the EMCs at issue are "molding powders." Pl.'s Brief at 5; Def.'s Brief at 4.  The Explanatory Notes to Chapter 39 further explain that "powder[s]" in "primary form" may consist of either "unplasticised materials which become plastic in the moulding and curing process" or "materials to which plasticisers have been added."  In either case:

> [T]hese materials may incorporate fillers (e.g., wood flour, cellulose, textile fibres,

---

[11]*See* Manas Chanda & Salil K. Roy, Plastics Technology Handbook, 688 (Marcel Dekker Inc. 3d ed. 1998) ("Epoxide or epoxy resins contain the epoxide group, also called the epoxy, oxirane, or ethoxyline group").

mineral substances, starch), *colouring matter or other substances* cited . . . above [*i.e.*, substances "such as plasticisers, stabilisers, fillers and colouring matter, *chiefly intended to give the finished products special physical properties or other desirable characteristics*."]

Explanatory Notes, Gen. Note to Ch. 39 at 596-97 (1996) (emphases added).[12]

Thus, as used in heading 3907 and subheading 3907.30.00, the phrase "epoxide resins in primary forms" does not refer only to *pure* resins. The Explanatory Notes expressly contemplate that materials such as fillers, coloring matter, and other substances may be included as well. *See* Explanatory Notes, Gen. Note to Ch. 39 at 596-97; Pl.'s Brief at 10.

Silica and quartz are "mineral substances," which are identified as permissible "fillers" in the Explanatory Notes. *See*, *e.g.*, Polymer Science Dictionary 197 (2d ed. 1997) (noting that silica and quartz are "mineral substances"); Explanatory Notes, Gen. Note to Ch. 39 at 596-97. Moreover, the silica and quartz in the EMCs here at issue increase the durability of the epoxide.[13] They are therefore "chiefly intended to give the finished product *special physical properties* or *other desirable characteristics*." *See* Pl's Brief at 6; Explanatory Notes, Gen. Note to Ch. 39 at 596-97 (emphases added).

_____

[12]The portions of the Explanatory Notes addressed herein are identical in the 1987 and 1996 versions of that document. For the sake of convenience, all references herein are to the 1996 version.

The Explanatory Notes "provide a commentary on the scope of each heading of the [HTSUS] and are thus useful in ascertaining the classification of merchandise under the system." H.R. Conf. Rep. No. 100-576, at 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582. "While the Explanatory Notes do not constitute controlling legislative history, they do offer guidance in interpreting HTSUS subheadings." Lonza, Inc. v. United States, 46 F.3d 1098, 1109 (Fed. Cir. 1995) (internal citations omitted).

[13]*See* section I, *supra*.

Because they comprise only epoxide resins and other substances expressly permitted by the Explanatory Notes, Amoco concludes that the EMCs at issue are properly classified as "epoxide resins in primary forms" under subheading 3907.30.00.  *See* Govesan Am. Corp. v. United States, 25 CIT 1142, 1146, 167 F. Supp. 2d 1374, 1379 (2001) (where other substances added to epoxy resins were accounted for in the Explanatory Notes, resulting compounds were properly classified as "epoxy resins in primary forms" under heading 3907); Expancel, Inc. v. United States, 24 CIT 128 (2000) (presence of substance which was functionally a "filler" did not preclude classification of compounds as acrylic polymers in primary forms).

The Government concedes (as it must) that epoxide resins in primary form "may incorporate fillers (*e.g.*, wood flour, cellulose, textile fibers, mineral substances, starch), coloring matters, plasticisers, or stabilizers, chiefly intended to give the finished products special physical properties or other desirable characteristics."  Def.'s Brief at 8-9.  But the Government protests that the additional substances here "make up the majority of the product by weight and change the properties of the [EMCs] in a desirable manner."  *Id*. at 9.  The Government therefore dismisses Amoco's asserted classification as "the exception that swallows the rule," and an outcome that "would certainly not be in accord with Expancel."  *Id*; *see also* Byington Decl. ¶¶ 16-17 (silicon and quartz not "fillers," because of the "amount and function" in the EMCs).

The Government argues, in essence, that Expancel promulgated a new definition of "primary form":  Something that "changes the properties of that to which it is added in some desirable manner."  *See* Def.'s Brief at 7 (*quoting* Expancel, 24 CIT at 132 n.5 ("[T]he unifying characteristic found in the Explanatory Notes appears to be that the addition of a primary form product changes

the properties of that to which it is added in some desirable manner.")); Def.'s Reply Brief at 5.

Emphasizing that, in the instant case, silica and quartz impart many of the qualities of the EMCs, the Government argues that – under Expancel – the silica and quartz *themselves* constitute "primary forms," because they "change[] the properties of that to which [they are] added in some desirable manner." *See* Def.'s Reply Brief at 5, 7. The Government therefore concludes that the EMCs at issue are not epoxide resins in primary form but, instead, are "mixture[s] of several primary constituents, each making its own contribution to the functionality of the product." Def.'s Brief at 7 (citations omitted); *see also* Def.'s Reply Brief at 8, 11.

The Government, however, fails to reconcile its reading of Expancel with the plain language of the Explanatory Notes (quoted above). Nor can it do so. By their very terms, the Explanatory Notes expressly contemplate that a "primary form" may include "fillers" and other substances – *and* that those "fillers" and other substances may impart "special physical properties or other desirable characteristics." Explanatory Notes, Gen. Note to Ch. 39 at 596-97. To the extent that the Government reads Expancel to hold that classification of a compound as a "primary form" is *precluded* by the presence of substances imparting "special properties or other desirable characteristics," that reading cannot be sustained.[14] Indeed, even where such substances are essential components or "*necessary* ingredients," compounds are nevertheless classifiable as epoxide resins "in primary forms." *See* Govesan, 25 CIT at 1146, 167 F. Supp. 2d at 1379 (emphasis added). In

---

[14]There is, moreover, a fundamental flaw in the Government's logic. It may well be true that – as Expancel seems to suggest – all "primary form" products change the properties of that to which they are added in some desirable manner. But, contrary to the Government's claims, it does not follow that all substances that change the properties of that to which they are added in some desirable manner are necessarily "primary form" products. (All cats are animals; but not all animals are cats.)

short, the Government's emphasis on the importance of the silica and quartz is unavailing.

The Government's focus on the quantity of silica and quartz in the EMCs is similarly lacking in merit. *See*, *e.g.*, Def.'s Brief at 9 (emphasizing that "additional substances make up the majority of the product by weight").[15] Indeed, the Government appears to beat a retreat from that argument in its reply brief.[16]

In any event, contrary to the Government's implication, the Explanatory Notes to Chapter 39 do not define or limit in terms of their weight or value (vis-a-vis the goods as a whole) either the "fillers" or the "other material chiefly intended to give the finished products special physical properties or other desirable characteristics."[17] *See* Pl.'s Response Brief at 5.[18]

---

[15]*See also* Def.'s Brief at 9 (asserting that epoxide resins "constitute only a minor portion of the products by weight – approximately 7% to 25%," and that the EMCs "contain 60-85% silica and quartz"), 10 (arguing that "resins never constitute as much as 50% of the compounds by weight, do not constitute the single largest component of the merchandise, and frequently constitute only a minor portion of the product").

[16]*See* Def.'s Reply Brief at 7 (arguing that Amoco misstated the Government's argument, and asserting that the Government never claimed that – to constitute a "primary form" – the epoxy resin "would have to predominate by weight"). *But see* Def.'s Brief at 11 ("Moreover . . . the imported mixtures are not epoxide resins because resins make up less than fifty percent of the merchandise by weight.").

[17]The Government's own authorities recognize, for example, that molding powders can incorporate silica "fillers" of as much as 73% by weight, and yet still constitute "primary forms" under the HTSUS. *See* 9 Kirk-Othmer Encyclopedia of Chemical Technology 382, 751; 17 Encyclopedia of Chemical Technology 1038.

The Government's authorities thus refute any notion that "fillers" and other such substances must, by definition, constitute a relatively low percentage of a compound's weight. The Kirk-Othmer Encyclopedia specifically states that over 70% *silica filler* can reduce the thermal coefficient of expansion in integrated circuitry. *See id.* 382 (emphasis added). It also describes a common system for encapsulation with epoxy resins "heavily (60-65 wt %) filled with *silica fillers*." *Id.* at 752 (emphasis added). Another volume explains that a "typical crystalline *silica-filled* molding

The Government attempts to make its case on this point by *reductio ad absurdum*, asserting that "Amoco essentially argues that as long as there is *some* epoxide resin in primary form in a mixture, then the entire mixture is classifiable as an epoxide resin in primary form." *See* Def.'s Brief at 11 (emphasis added). The Government maintains that "under Amoco's reasoning, there appears to be no point at which the epoxide resins become *de minimis*." *Id*.

But the case postulated by the Government is one for another day. There is no claim here that Amoco added some infinitesimally minuscule quantity of epoxide resin to its EMCs for the sole purpose of staking a claim to classification as "epoxide resins in primary form" under heading 3907. In any event, it appears that the Government's doomsday scenario is anticipated and addressed by the Explanatory Notes, which impose a *qualitative* limit on the on the extent of "fillers" or "other materials" permissible in "epoxy resins in primary forms":

---

compound" would incorporate 73% by weight *silica filler*. 17 <u>Kirk-Othmer Encyclopedia of Chemical Technology</u> 1038 (emphasis added).

The imposition of any specific quantitative limit could have the unintended effect of eliminating many of the molding powders that are specifically intended to be classified under heading 3907. HTSUS Ch. 39 n.6(b); Explanatory Notes Gen. Note to Ch. 39 at 597.

In contrast, quantitative limits have been imposed elsewhere in the Explanatory Notes to Chapter 39. Specifically, the General Notes to that chapter expressly provide that – with respect to certain solutions – "when the weight of the solvent *exceeds 50%* of the weight of the solution," the solutions are "excluded from . . . Chapter [39] and fall in heading 32.08." *See* Explanatory Notes, Gen. Note to Ch. 39 at 596-97 (emphasis added).

[18]In its brief, the Government attempts to rely on <u>Govesan</u> to support a limit on "fillers" at 50% by weight. *See* Def.'s Brief at 10-11 ("[U]nder the reasoning of <u>Govesan</u>, . . . the imported mixtures are not epoxide resins because resins make up less than fifty percent of the merchandise by weight."). However, that section of <u>Govesan</u> is specifically addressing whether the merchandise there at issue was "'principally' of plastics" – not whether the merchandise was "epoxide resins in primary forms."

When as a result of the addition of certain substances, the resultant products answer to the description in a more specific heading elsewhere in the Nomenclature, they are *excluded* from Chapter 39.

Explanatory Notes, Gen. Note to Ch. 39 at 597.[19]

## B.  Customs Ruling HQ 961071

The Government asserts that Skidmore deference should be accorded Customs' ruling rejecting Amoco's proposed classification under heading 3907 and classifying the EMCs under subheading 3824.90.28 instead.  *See* Def.'s Brief at 6.  That ruling, however, includes no substantive analysis of whether the imported merchandise could be classified under heading 3907.  In three lines, Customs dismissed the heading, with no indication that the agency even considered Amoco's arguments:

> Based on analysis of the merchandise . . . Plaskon does not constitute a plastic in primary forms.  Rather, it is a mixture of several primary constituents, each making its own contribution to the final product.  Therefore, the merchandise is not classified in subheading 3907.30, HTSUS, for epoxide resins in primary forms.

HQ 961071 (original emphasis omitted).

Customs' ruling includes no discussion of "molding powders" or "fillers," no discussion of the agency's position on the difference between "fillers" and "primary constituents," no analysis of when a "filler" becomes a "primary constituent," no explanation as to the agency's position on appropriate quantities of "fillers" in "epoxy resins in primary forms," and no discussion of

---

[19]This "qualitative" limit imposed by the Explanatory Notes is listed under the section titled "Primary forms," and specifically under the caption "Liquids and pastes."  *See* Explanatory Notes, Gen. Note to Ch. 39 at 596-97.  Its reasoning, however, extends to "[p]owders, granules and flakes," which have similar characteristics because that section states that it "may incorporate fillers . . . and other substances cited under [liquids and pastes]."  *See id.*

permissible end uses of "epoxide resins in primary forms." Further, Customs made no mention of the applicable Notes or the relevant case law. Under such circumstances, Customs' ruling is entitled to no deference.

### C. HTSUS Heading 3824

Because the EMCs at issue are classifiable under heading 3907, they cannot be classified under heading 3824. Heading 3824 covers "chemical products and preparations . . . *not elsewhere specified or included*." (Emphasis added.) Thus, on its face, heading 3824 applies only if the imported merchandise is not classifiable under any other heading. *See e.g.,* Lynteq, Inc. v. United States, 976 F.2d 693, 698-99 (Fed. Cir. 1992) (explaining that, if an item is expressly provided for elsewhere, it cannot be included under a heading with language stating "not elsewhere specified or included"). *See* Pl.'s Brief at 13.[20]

---

[20]Because the EMCs are not classifiable under heading 3824, there is no need to reach the parties' arguments as to the proper subheading thereunder. *See* Pl.'s Brief at 13-17; Pl.'s Response Brief at 6-8; Def.'s Brief at 12-20; Def.'s Reply Brief at 7-9.

## IV. <u>Conclusion</u>

For all the reasons set forth above, the EMCs at issue in this action are properly classified as "epoxide resins in primary forms," under subheading 3907.30.00 of the HTSUS. Amoco's motion for summary judgment is therefore granted – and the Government's cross-motion is denied – except as to those claims discussed in section II above, which are dismissed on the Government's cross-motion.

Judgment will enter accordingly.

_____/s/_____
Delissa A. Ridgway
Judge

Decided:  December 9, 2005
          New York, New York

<u>ERRATA</u>

<u>Amoco Corporation v. United States</u>, Court No. 99-00399, Slip Op. 05-156, dated December 9, 2005.

Page 2:    In footnote 2, replace "Plaskeen Melamine." with "Plaskleen Melamine." [Maintain the punctuation of the original.]

In the last line of footnote 4, replace "both heading 3823" with "both headings 3823".

Page 4:    Replace the entirety of the original text of footnote 6 with: "*See* Pl.'s Brief at 6 (*citing* <u>Encyclopedia of Semiconductor Technology</u> 195 (1984)). *See also* Pl.'s Statement ¶ 1; Defendant's Response to Plaintiff's Statement of Material Facts Not in Issue ("Def.'s Response Statement") ¶ 1; Plaintiff's Request for Admissions ("Pl.'s Request for Admissions") ¶¶ 8-26; Defendant's Response to Plaintiff's Revised Request for Admissions ("Def.'s Admissions") ¶¶ 8-26; 9 <u>Kirk-Othmer Encyclopedia of Chemical Technology</u> 381-82, 751-52 (4th ed. 1996); <u>Hawley's Condensed Chemical Dictionary</u> 447 (14th ed. 2001); <u>Kirk-Othmer Concise Encyclopedia of Chemical Technology</u> 432-33 (1985); <u>McGraw-Hill Dictionary of Chemistry</u> 223 (1984)."

In footnote 7, delete "(Rev. ed. 1986)", and replace it with "(rev. ed. 1986)".

In footnote 8, delete "Request for Admissions ¶¶ 8-28; Def.'s Admission ¶¶ 8-28.", and replace it with "Pl.'s Request for Admissions ¶¶ 8-26; Def.'s Admissions ¶¶ 8-26."

Page 5:    In line five of the first full paragraph, delete "*See* Request for Admissions ¶ 1;" and replace it with "*See* Pl.'s Request for Admissions ¶¶ 8-26; Def.'s Admissions ¶¶ 8-26;".

Page 8:    In line three of the third full paragraph, delete "Explanatory Notes, Ch. 39 Note 6 at 590." Replace it with "Chapter 39, Note 6(b), HTSUS (1995-97)."

In footnote 11, delete "*See* Manas Chanda & Salil K. Roy, <u>Plastics Technology Handbook</u>, 688 (Marcel Dekker Inc. 3d ed. 1998)", and replace it with "*See* <u>Plastics Technology Handbook</u> 688".

Page 9:    In the citation immediately following the block quote at the top of the page, delete "Explanatory Notes, Gen. Note to Ch. 39 at 596-97", and replace it with "Explanatory Notes to Chapter 39 at 596-97".

In the last line of the first full paragraph, delete "Explanatory Notes, Gen. Note to Ch. 39 at 596-97;", and replace it with "Explanatory Notes to Chapter 39 at 596-97;".

In the third line of the second full paragraph, delete "Explanatory Notes, Gen. Note to Ch. 39 at 596-97."  Replace it with "Explanatory Notes to Chapter 39 at 596-97."

In the penultimate line of the second full paragraph, delete "Explanatory Notes, Gen. Note to Ch. 39 at 596-97", and replace it with "Explanatory Notes to Chapter 39 at 596-97".

In the first paragraph of footnote 12, delete "1987", and replace it with "1986".

In the penultimate line of footnote 12, delete "interpreting HTSUS", and replace it with "interpreting HTS[US]".

Page 10:      In the first line, delete "permitted", and replace it with "envisioned".

In the penultimate line of the second paragraph, delete "(silicon and", and replace it with "(silica and".

Page 11:      In the last line of the first full paragraph, delete "8, 11.", and replace it with "6 (asserting that the EMCs at issue "are no longer resins in primary form, but rather are a product engineered *from* resins in primary form")."

In line five of the second full paragraph, delete "Explanatory Notes, Gen. Note to Ch. 39 at 596-97."  Replace it with "Explanatory Notes to Chapter 39 at 596-97."

Page 12:      In footnote 16, after "at" and before "11", insert the following text:  "9 (arguing that EMCs cannot be classified as epoxide resins in primary form "where, as here, the additional substances [other than epoxide resins] make up the majority of the product by weight"; "It is precisely because the epoxide resins constitute such a small portion of the mixtures that these mixtures cannot be considered epoxide resins in primary form."); 10 (seeking to distinguish instant case from <u>Govesan</u>, emphasizing that <u>Govesan</u> court found that "[r]esins are the largest single component of the subject merchandise," and contrasting <u>Govesan</u> with "the instant case, [where] the resins never constitute as much as 50 percent of the compounds by weight, do not constitute the largest single component of the merchandise, and frequently constitute only a minor portion of the product");".

In the first paragraph of footnote 17, delete "17 <u>Encyclopedia of Chemical Technology</u> 1038."  Replace it with "17 <u>Kirk-Othmer Encyclopedia of Chemical Technology</u> 1038."

In the second paragraph of footnote 17, delete "*See id*. 382 (emphasis added)." Replace it with "*See* 9 <u>Kirk-Othmer Encyclopedia of Chemical Technology</u> 382 (emphasis added)."

Page 13:    Delete all eleven lines of the main text on this page, beginning with "The Government attempts . . .", through "In any event, it appears that the Government's doomsday scenario is anticipated and addressed by the Explanatory Notes, which impose a *qualitative* limit on the extent of "fillers" or "other materials" permissible in "epoxy resins in primary forms":".

In the third paragraph of footnote 17, delete "HTSUS Ch. 39 n.6(b); Explanatory Notes Gen. Note to Ch. 39 at 597." Replace it with "*See* Chapter 39, Note 6(b), HTSUS; Explanatory Notes to Chapter 39 at 597."

Delete the last paragraph of footnote 17.

At the end of the existing text of footnote 18, add: "*See* Govesan, 25 CIT at 1149, 167 F. Supp. 2d at 1381-82."

Add the following three new paragraphs at the end of footnote 18:

The Government also attempts to make its case on this point by *reductio ad absurdum*, asserting that "Amoco essentially argues that as long as there is *some* epoxide resin in primary form in a mixture, then the entire mixture is classifiable as an epoxide resin in primary form." *See* Def.'s Brief at 11 (emphasis added). The Government maintains that "under Amoco's reasoning, there appears to be no point at which the epoxide resins become *de minimis.*" *Id.*

But the case postulated by the Government is one for another day. There is no claim here that Amoco added some infinitesimally minuscule quantity of epoxide resin to its EMCs for the sole purpose of staking a claim to classification as "epoxide resins in primary form" under heading 3907. Moreover, the Explanatory Notes can be read to impose a *qualitative* limit on the extent of "fillers" or "other materials" permissible in "epoxy resins in primary forms":

When as a result of the addition of certain substances,
the resultant products answer to the description in a
more specific heading elsewhere in the Nomenclature,
they are *excluded* from Chapter 39[.]

Explanatory Notes to Chapter 39 at 597. This "qualitative" limit is listed under the section titled "Primary forms" and, more specifically, under the caption "Liquids and pastes." *See* Explanatory Notes to Chapter 39 at 596-97. However, the reasoning may logically extend to the text of the corresponding caption at issue here – "Powder, granules and flakes" – which expressly cross-references "Liquids and pastes." *See id.*

Even more to the point, the text of "Liquids and pastes" expressly precludes the classification under Chapter 39 of "solutions (other than collodions) consisting of any of the products specified in headings 39.01 to 39.13 in volatile organic solvents, *when the weight of the solvent exceeds 50% of the weight of the solution*." *See* Explanatory Notes to Chapter 39 at 596-97 (emphasis added). Significantly, the text of the provision here at issue – "Powders, granules and flakes" – includes no such quantitative limits whatsoever. *Id*.

Page 14: At the top of the page, delete the block quote and the citation that follows it, as well as footnote 19.

In the text of the block quote in the first full paragraph, delete "a plastic in primary forms." Replace it with "a plastic in primary form."

Page 15: Re-number footnote 20 so that it is footnote 19.

January 20, 2006